AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original  ☐ Duplicate Original

LODGED
CLERK, U.S. DISTRICT COURT
4/8/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: ___JB___ DEPUTY

# UNITED STATES DISTRICT COURT
for the
Central District of California

FILED
CLERK, U.S. DISTRICT COURT
April 8, 2021
CENTRAL DISTRICT OF CALIFORNIA
BY: ___VM___ DEPUTY

United States of America

v.

OMAR LANDEROS-NUNEZ,

Defendant

Case No.   2:21-mj-01698-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of March 4, 2021 in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*Barrett M. Warren*
Complainant's signature

Barrett M. Warren, DEA Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: April 8, 2021

City and state: Los Angeles, California

Judge's signature

Hon. Michael Wilner, U.S. Magistrate Judge
Printed name and title

AUSA: Ashley Fillmore – 213-894-2416

**AFFIDAVIT**

I, Barrett M. Warren, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrants against Angel GARCIA-VILLARREAL and Omar LANDEROS-NUNEZ for violations of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2. This affidavit is also made in support of an application for a warrant to search one digital device (the "SUBJECT DEVICE"), in the custody of the Drug Enforcement Administration in Los Angeles, California, as described more fully in Attachment A.

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute and distribution of controlled substances) and 846 (conspiracy to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless

specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are approximate.

## II. **BACKGROUND OF AFFIANT**

5.  I am a Special Agent with the United States Department of Justice, Drug Enforcement Administration ("DEA"), currently assigned to the DEA Los Angeles Field Division ("LAFD") Group 1. I have been employed as a Special Agent since April 2019.

6.  I received and completed formal training that included a 16-week DEA training program in Quantico, Virginia. I have specialized training and experience in the investigation of major narcotics trafficking organizations involved in violent crime, racketeering, conspiracy crimes, and narcotics importation and distribution.

7.  I have participated in debriefing defendants and informants who had personal knowledge regarding major narcotics trafficking organizations, including cartels based in Mexico. Additionally, I have participated in many aspects of drug investigations, including conducting surveillance and court-ordered interceptions of wire communications. I am familiar with narcotics traffickers' methods of operation, including the manufacture, storage, transportation, and distribution of narcotics, the collection of money that represents the proceeds of narcotics trafficking, and money laundering.

8.  I am also familiar with the sophisticated methods that drug organizations use to avoid detection by law enforcement, such as the use of multiple cellphones, pre-paid calling cards,

counter-surveillance measures, established relationships with legitimate businesses to hide drugs and launder drug proceeds, vehicles with concealed compartments, false or fictitious identities, and coded and/or vague communications and conversations over cellphones, including text messages. I am aware that drug traffickers drop or switch telephones and/or telephone numbers frequently to thwart law enforcement investigations of their criminal activities.

### III. SUMMARY OF PROBABLE CAUSE

9. After being connected through a confidential source ("CS-1"), an undercover DEA agent ("UC-1") conversed with a Mexican Source of Supply and his courier, "Angel" (later identified as Angel GARCIA-VILLARREAL), about purchasing fentanyl pills in Los Angeles, California. On or about March 2, 2021, GARCIA-VILLARREAL told UC-1 that he had "1000 blue" pills, and further agreed to meet UC-1 the next day to do the drug deal.

10. On or around March 3, 2021, GARCIA-VILLARREAL called UC-1 to coordinate and later delivered to UC-1 a clear plastic baggie containing approximately 161 gross grams of light blue pills. The DEA Southwest laboratory later confirmed that the pills had a net weight of approximately 102 grams and contained fentanyl.

11. On or around March 17, 2021, CS-1 communicated with the Source of Supply via WhatsApp chat about purchasing an additional 50,000 fentanyl pills and approximately 66 pounds of

methamphetamine.  Following additional communications, the deal was arranged to take place on April 7, 2021.

12.  On or around April 7, 2021, UC-1 received a call from an individual later identified as LANDEROS-NUNEZ to coordinate the drug deal.  Later that day, LANDEROS-NUNEZ delivered to UC-1 a backpack containing approximately 50,000 suspected fentanyl pills, weighing approximately 5,834 gross grams.

### IV. STATEMENT OF PROBABLE CAUSE

13.  Based on my review of law enforcement reports, my conversations with other law enforcement officers, and my own involvement in this investigation, I know the following:

**A.  In January and February 2021, a Source of Supply Coordinates with CS-1 the Sale of 1,000 Fentanyl Pills in Los Angeles**

14.  In January 2021, Special Agents of the LAFD DEA were in contact with a confidential source ("CS-1"),[1] who advised the DEA about a Source of Supply who could provide large quantities of fentanyl pills in the Los Angeles, California area.  At the direction of the DEA, CS-1 began communicating with the Source of Supply, who at the time was using a telephone number ending in 6306, to discuss the potential purchase of fentanyl pills.  At the direction of the DEA, CS-1 negotiated with the

---

[1] CS-1 has cooperated with the DEA since 2012.  Since that time, CS-1 has provided information for over 50 investigations, both foreign and domestic, including many involving drug seizures.  The information provided by CS-1 has been corroborated and has been proven to be reliable.  CS-1 has been convicted of a drug trafficking offense in the United States.  CS-1 has received immigration benefits from the DEA and is also working for financial compensation.

4

Source of Supply to purchase a sample of 1,000 fentanyl pills for $5,000.

15. On or around February 26, 2021, CS-1 provided the Source of Supply with the phone number for a DEA undercover agent ("UC-1") and told the Source of Supply that the phone number belonged to CS-1's Los Angeles-based courier.

### B. Angel GARCIA-VILLARREAL Contacts UC-1 to Arrange the Sale of 1,000 Fentanyl Pills

16. On or around On March 2, 2021, a then-unknown individual (later identified by UC-1 as Angel GARCIA-VILLARREAL) called UC-1, confirmed he had "1000 blue" pills, and added he was in Ontario, California. During the conversation, the individual agreed to meet UC-1 the next day to carry out the drug deal. Shortly thereafter, another unknown individual (later identified as "Bruno"), using a phone number ending in 4140, called UC-1 and confirmed the drug deal for the following day. Bruno said that the pills were "baby blue" and that if UC-1 liked them, Bruno could supply any amount requested.

17. On or around March 3, 2021, in a series of text messages, using a number ending in 8492, the then-unknown individual communicated with UC-1, and the two agreed to meet in the South Los Angeles area. At approximately 11:21 a.m., UC-1 texted the then-unknown individual, on the same 8492 number, with a meeting location in Bell Gardens, California. Shortly thereafter, UC-1 called the 8492 number, and the individual using the 8492 number confirmed he was en route to the meeting location.

5

18. On or around March 3, 2021, at approximately 11:34 a.m., the user of the 8492 number called UC-1 and said he was in the parking lot, driving a black Frontier pick-up truck. Shortly thereafter, SA Davis, who was conducting surveillance, observed a Nissan Frontier with California license plate number 0670B41 park next to UC-1. SA Davis saw a Hispanic male, later identified as GARCIA-VILLARREAL, exit the Nissan and enter UC-1's car. After greeting each other, UC-1 asked GARCIA-VILLARREAL to see the pills, and GARCIA-VILLARREAL produced a white plastic bag containing the light blue-colored pills. In the ensuing conversation, GARCIA-VILLARREAL offered that if UC-1 purchased large quantities of drugs, GARCIA-VILLARREAL could provide wholesale prices. GARCIA-VILLARREAL then quoted the following wholesale prices to UC-1: $3 per fentanyl pill; $1,050 per pound of methamphetamine; $18,000 per kilogram of brown heroin; and $31,000 per kilogram of cocaine. GARCIA-VILLARREAL also stated that he could supply powdered fentanyl and black tar heroin. Just before GARCIA-VILLARREAL left, UC-1 asked for his name, and he responded "Angel."

19. At approximately 11:48 a.m., SA Davis observed the Hispanic male exit UC-1's car and re-enter the Nissan and exit the parking lot.

20. That same day, following the drug deal, UC-1 received a call from Bruno, on the same phone number ending in 4140. Bruno asked how the drug deal had gone, and after UC-1 complained that the pills looked worn and their color was faded, Bruno said the pills he had in Tijuana, Mexico,

were "deep blue" and "strong," and that he had already tried them. Bruno also asked how much UC-1 paid and expressed his willingness to supply UC-1 with more drugs.

### C. Follow-Up Investigation on the Pills and the Nissan

21. Later on March 3, 2021, the DEA tested the suspected fentanyl pills that GARCIA-VILLARREAL delivered, which had an approximate weight of 161 gross grams. The pills tested presumptively positive for the presence of fentanyl, phencyclidine ("PCP"), and Xylazine.

22. On or about April 8, 2021, the DEA Southwest laboratory confirmed that the pills had a net weight of approximately 102 grams and contained fentanyl.

23. Using law enforcement databases, Torrance Police Department Detectives and I searched for the Nissan Frontier with California license plate number 0670B41. The search revealed that the truck was registered to an Angel Jimenez at an address in San Diego, California. The search also revealed that the truck had been parked at a hotel called the Bellflower Travel Inn in Bellflower, California, on February 27, 2021. I obtained records from the hotel, which showed that an individual named Angel GARCIA-VILLARREAL stayed at the hotel on that day. The hotel also provided a copy of his Mexican identification card. The photo on the identification card matched the physical description of "Angel" from the buy walk. The hotel also provided a registration form showing that he drove a black Nissan Frontier truck, which is the same type of truck "Angel" drove to deliver the fentanyl pills on March 3, 2021. I also

7

reviewed the hotel's surveillance footage, which showed GARCIA-VILLARREAL getting in and out of the truck.

24. On or around March 9, 2021, I showed UC-1 an image from the hotel's surveillance footage, as well as a picture of Angel GARCIA-VILLARREAL's identification card. UC-1 positively identified the individual as "Angel" who sold UC-1 the fentanyl pills on March 3, 2021.

### D. Bruno Arranges the Sale of 50,000 Fentanyl Pills and 60 pounds of Methamphetamine to CS-1

25. On or about March 10, 2021, CS-1 and Bruno (using the same number ending in 4140), negotiated via WhatsApp the purchase of approximately 50,000 fentanyl pills and 66 pounds of methamphetamine for $5 per fentanyl pill, and $2,500 per pound of methamphetamine.

26. On March 17, 2021, Bruno agreed to do the drug deal on March 19, 2021. Bruno further told CS-1 that a new courier (i.e., not GARCIA-VILLARREAL) would be delivering the drugs on March 19, 2021, and that he would provide the courier's phone number the following day.

27. On March 18, 2021, CS-1 and Bruno (using the same number ending in 4140), confirmed via WhatsApp that the deal would take place at 10:00 a.m. on March 19, 2021. Bruno said that he would give CS-1 the courier's phone number the next morning.

28. On or around March 19, 2021, various individuals reached out to UC-1 regarding this planned drug purchase. These associates told UC-1 several times throughout the day that they

were getting the drugs ready and they would be ready to do the deal soon. However, the purchase did not take place that day.

### E. Bruno's Brother Arranges the Sale of 50,000 Fentanyl Pills and 60 pounds of Methamphetamine to CS-1

29. On or around March 23, 2021, CS-1 received a call from an individual who identified himself as "Joe," who is another drug broker that CS-1 knows. Joe told CS-1 that an individual (later identified as "Junior") was asking about CS-1 and that Joe wanted to have a three-way call with CS-1 and Junior. Joe then connected CS-1 with Junior and they had a phone call. During this phone call and several other communications that followed, Junior stated that he is Bruno's brother, and his courier was sleeping on Friday, March 19, which is why they did not bring the drugs as planned on that day. CS-1 and Junior then agreed to try to do the same deal as before (i.e., 60 pounds of methamphetamine and 50,000 fentanyl pills). They agreed for the deal to take place on April 7, 2021.

30. On or around April 6, 2021, CS-1 provided to Junior the phone number for CS-1's purported Los Angeles-based courier, which was, in actuality, UC-1's phone number. Junior told CS-1 that his courier would call UC-1 that evening.

31. At approximately 7:58 p.m., a phone number ending in 3487, later confirmed to be used by LANDEROS-NUNEZ, called UC-1. UC-1 called back shortly after and no one answered.

9

### F. On April 7, 2021, LANDEROS-NUNEZ Sells Approximately 50,000 Fentanyl Pills to UC-1

32. On or around April 7, 2021, at approximately 9:30 a.m., UC-1 received a call from the 3487 number. The caller stated, in Spanish, that he had "5 boxes" and "50,000 seeds" ready for UC-1. The caller also stated that he was coming from Downey, California and that he was ready to meet UC-1. At approximately 11:13 a.m., via phone call and text messages, UC-1 communicated with the user of 3487 number and told him to meet him at the Ross Dress for Less store at 12130 Lakewood Blvd. in Downey, California. The user of the 3487 number confirmed and told UC-1 that he was 20 minutes away.

33. At approximately 11:59 a.m., during several short phone calls, the user of the 3487 number asked UC-1 exactly where he was located. At approximately 12:08 p.m., UC-1 called the 3487 number, and the user told UC-1 that he was in front of the Ross Dress for Less. UC-1 got out of the car and saw an individual, later identified as LANDEROS-NUNEZ, in front of Ross Dress for Less talking on the phone. UC-1 waved LANDEROS-NUNEZ down and directed him to come to UC-1's car. Once LANDEROS-NUNEZ got to the car, UC-1 asked LANDEROS-NUNEZ if he had the 50,000, and LANDEROS-NUNEZ acknowledged that he did. UC-1 then asked LANDEROS-NUNEZ if it was in LANDEROS-NUNEZ's backpack, and LANDEROS-NUNEZ confirmed that it was. UC-1 noticed that LANDEROS-NUNEZ had a cane with him, so UC-1 helped LANDEROS-NUNEZ take the backpack off. UC-1 then opened the backpack, saw

the drugs, and signaled the other law enforcement officers at the scene.

34. LANDEROS-NUNEZ was arrested. Agents seized the backpack, which contained approximately 50,000 suspected fentanyl pills. A preliminary field test by DEA agents using an MX908 testing device was inconclusive as to the presence of fentanyl but revealed that the pills tested presumptively positive for the presence of Xylazine. Based on my training and experience, I know that the presence of Xylazine is known to obscure the presence of fentanyl when using the MX908 testing device, and is also found in high concentrations in kilograms of fentanyl. The pills weighed approximately 5,834 gross grams and have since been sent to the DEA Southwest Laboratory for further analysis and testing. Agents seized the SUBJECT DEVICE from LANDEROS-NUNEZ's pants pocket.

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

35. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

11

    b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

    c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

    d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

    e. Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their

vehicles in the event of an unexpected opportunity to sell narcotics arises.

      f.   Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

      g.   Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking.  These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

      h.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

36.  As used herein, the term "digital device" includes the SUBJECT DEVICE.

13

37. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

 a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

 b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat

14

programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

        c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    38.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

        a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

        b.    Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of

data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

39. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

    a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

    b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

16

    c. The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress LANDEROS-NUNEZ's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of LANDEROS-NUNEZ's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

 40. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

 41. For the reasons described above, there is probable cause to believe that Angel GARCIA-VILLARREAL and Omar LANDEROS-NUNEZ have committed violations of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __8th__ day of
__April__, 2021.

_____
HONORABLE MICHAEL WILNER
UNITED STATES MAGISTRATE JUDGE